IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FILED BY _____ D.C.

05 JUL -1 AM 7: 53

THOMAS M. GOULD
CLERK, U.S. DISTRICT COURT
W/D OF TN, MEMPHIS

| | |
|---|---|
| OLEN M. BAILEY, JR.,<br>Individually, TERESA W.<br>BAILEY, Individually, THE<br>BAILEY LAW FIRM, A<br>Professional Corporation, and<br>OLEN M. BAILEY, JR. and TERESA<br>W. BAILEY, as Successors of<br>UNBORN BAILEY BABY GIRL,<br><br>    Plaintiffs,<br><br>vs.<br><br>DECK - White Station Tower,<br>LLC, DECK - White Station<br>Manager, LLC, KAUFMAN<br>PROPERTIES, INC., KAUFMAN<br>REALTY GROUP, LLC, TRAMMEL<br>CROW COMPANY, P.C., INC.,<br>SANITORS, INC., and JOHN/JANE<br>DOES, Individually,<br><br>    Defendants and<br>    Third-Party Plaintiffs,<br><br>vs.<br><br>D.L. SCHMITZ WATERPROOFING &<br>RESTORATION COMPANY, INC., and<br>KERMIT B. BUCK & SON, INC.,<br><br>    Third-Party Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>No. <u>04-2395 D/P</u> |

---

## ORDER DENYING DEFENDANTS' MOTION FOR PROTECTIVE ORDER

---

Before the court is defendants Kaufman Properties, Inc. and

Kaufman Realty Group, LLC's (collectively referred to as "Kaufman")

Motion for Protective Order, filed on February 14, 2005 (dkt # 33).
Plaintiffs filed their response on March 14, 2005.   A motion
hearing was set for April 5, 2005; however, at the request of
counsel, the hearing was continued to June 1, 2005.   At the
hearing, counsel for all interested parties were present and
heard.[1]  For the reasons below, the motion for protective order is
DENIED.

## I. BACKGROUND

According to the amended complaint, plaintiffs Olen M. Bailey,
Teresa W. Bailey, and The Bailey Law Firm have occupied an office
located in White Station Tower ("WST") in Memphis, Tennessee, since
1994.[2]  Prior to purchasing WST on July 17, 1998, Kaufman received
a notice of water intrusion in WST Suite 1710, which was
Plaintiffs' office.   (Amended Complaint ¶¶ 11-12, Kaufman Answer ¶
11-12.)   In November 1998, Kaufman commenced renovation of WST,
which included waterproofing.   (Kaufman Answer ¶ 19.) Plaintiffs
did not complain about water intrusion again until September 26,
2002.  (Amended Complaint ¶ 21.)   Immediately after another
complaint was made by Plaintiffs on February 24, 2003, Kaufman

---

[1]Because the motion was limited to a discovery dispute
between the plaintiffs and defendant Kaufman, and since the
dispute involved allegedly privileged documents, the hearing was
conducted under seal and counsel for all parties other than the
plaintiffs and Kaufman were excused from attending the hearing.

[2]Plaintiffs amended their complaint on October 27, 2004,
adding Olen M. Bailey and Teresa W. Bailey as Successors of an
unnamed, unborn baby girl.

hired Dr. Richard Lipsey, a toxicologist from Florida, to perform tests for mold.  (Amended Complaint ¶ 22, Kaufman Answer ¶ 22, 24.)

Dr. Lipsey evaluated conditions in WST on multiple occasions. Dr. Lipsey's first set of tests were conducted on March 11, 2003. (See E-mail from Dr. Lipsey to Susan Tippens dated March 12, 2003 attached to Kaufman's motion.)  Dr. Lipsey conducted another set of tests at WST on May 13, 2003.  The laboratory results from these tests were produced to Plaintiffs on June 17, 2003, and shortly thereafter, Kaufman held a WST tenant's meeting, during which Kaufman made Dr. Lipsey available for questioning by the tenants, including the Plaintiffs.

At about the same time Kaufman retained the services of Dr. Lipsey, Kaufman also hired the law firm of Drew, Eckl, and Farnham, LLP.[3]  According to Kaufman, sometime in April of 2003, an attorney with that law firm, Joseph Chancey, contacted Dr. Lipsey to serve as a consulting expert witness.  It is unclear from the record before the court, however, whether Dr. Lipsey was, in fact, retained by Chancey.  In his affidavit filed with the court, Chancey states that he retained Dr. Lipsey, and Kaufman attempts to support that statement by attaching what they contend is a contract for expert consulting services.  The contract apparently was signed by Chancey on April 17, 2004, but it does not contain Dr. Lipsey's

---

[3]In an affidavit filed with the court on February 14, 2005, attorney Chancey states that his firm was retained by Kaufman "in or around March 2003."

signature.  In his sworn statement that Plaintiffs filed with the court on March 14, 2005, Dr. Lipsey maintained that he did not remember seeing that contract until Plaintiffs' counsel sent it to him in February 2005.  He stated that the contract is similar to his standard agreement, a sample of which he sent to Kaufman in March 2004.  However, the "contract" that Kaufman alleges he signed contained provisions that he had not previously seen.  Moreover, Dr. Lipsey stated that he was never aware of any potential litigation, and that he simply thought he was hired to perform an environmental sampling in order to give the building a "clean bill of health" for a potential sale.

Plaintiffs filed this lawsuit in May 2004, alleging damages and injuries caused by "airborne toxins from mold" in their law office.  In its answer, Kaufman alleges a comparative fault defense, listing Dr. Lipsey as an individual who may be liable for Plaintiffs' alleged injuries and damages.  (Kaufman Answer 3.)  The answer states that Dr. Lipsey was "to provide advice for resolving mold issues that were discovered at White Station Tower."  (Kaufman Answer 4.)  Kaufman, however, did not include Dr. Lipsey as a potential witness on its Rule 26 initial disclosures.  (Plaintiffs' Response 2.)  Plaintiffs investigated Dr. Lipsey's involvement with Kaufman, requesting Kaufman produce all documents evidencing any interaction between Kaufman and Dr. Lipsey.  (Plaintiffs' Response 2.)  Kaufman produced thirteen responsive documents but did not

-4-

submit a privilege log or indicate that there were any other responsive documents. (Plaintiffs' Response 3.) Subsequently, plaintiffs sent these thirteen documents to Dr. Lipsey and inquired as to whether he might have additional documents that evidenced interaction between himself and Kaufman. (Plaintiffs' Response 3.) Dr. Lipsey indicated he had additional documents in his possession but would not produce them without a subpoena. (Plaintiffs' Response 3-4.)

On October 20, 2004, a subpoena was served on Dr. Lipsey's company, directing it to produce all documents in its possession related to WST and Kaufman by October 22, 2004. Plaintiffs served a notice of the subpoena on Kaufman on October 19, 2004. (Plaintiffs' Response 4.) Dr. Lipsey produced twenty-seven documents on October 26. (Plaintiffs' Response 4.) Out of those twenty-seven documents, thirteen were duplicative of the documents Kaufman already produced. Plaintiffs forwarded to Kaufman a copy of all the documents Dr. Lipsey produced on October 27. Kaufman now claims that the remaining fourteen documents are protected by the attorney-client privilege and/or the work product doctrine. It seeks a protective order to require Plaintiffs either to return those documents or to prevent further production of these documents or information contained therein.

Kaufman did not file a motion to quash the subpoena prior to Dr. Lipsey's production of the documents. In fact, Kaufman first

contacted Plaintiffs' counsel on November 11 to inform counsel that the documents produced by Dr. Lipsey were privileged. Kaufman stated that it "did not foresee that Dr. Lipsey, an expert with more than thirty (30) years of experience, would disclose privileged material in response to the Plaintiff's [sic] Deposition Subpoena." (Motion at ¶ 2.)

## II.  ANALYSIS

Motions for protective order are generally governed by Federal Rule of Civil Procedure 26. The present situation is complicated, however, by the fact that the documents were produced by a non-party pursuant to a subpoena issued from another district. Rule 45 governs non-party subpoenas. Because Kaufman is objecting to the use of documents produced pursuant to a subpoena, this court must look to both Rule 26 and Rule 45. See Oneida, Ltd. v. United States, 43 Fed. Cl. 611, 616 n.8 (Fed. Cl. 1999)("To allow plaintiff to raise objections to a subpoena after the time prescribed by the rules short circuits the rationale of the rule, which obviously is designed to resolve disputes regarding production within a short time frame."). Thus, in addition to the issues of whether the documents at issue are protected by the attorney-client privilege or the work product doctrine, ancillary issues pertaining to Rule 45, such as whether this is the proper district to resolve the dispute and whether Kaufman complied with the procedural deadlines of the federal rules, must be resolved.

-6-

## A.   Proper Court

There is significant overlap between Rule 26 and Rule 45.
See, e.g., Hickman v. Taylor, 329 U.S. 495, 505 (1947)(stating that
Rules 26, 33, 34, and 45 "create integrated procedural devices");
In re Sealed Case, 141 F.3d 337, 342 (D.C. Cir. 1998)(stating that
there is broad overlap in the grounds for granting a motion to
quash under Rule 45 and a motion for protective order under Rule
26); Dag Enter., Inc. v. Exxon Mobile Corp., 226 F.R.D. 95, 104
(D.D.C. 2005)(stating that "Rule 45 subpoenas are 'discovery' under
Rules 16 and 26").   Nevertheless, the two rules have distinct
jurisdictional provisions.   Under Rule 26(c), the court in which
the action is pending may issue a protective order.   Language in
Rule 45, however, indicates that only the issuing court has the
power to act on its subpoenas.   In re Sealed Case, 141 F.3d at 342.
Although Rule 45 generally applies to non-parties, some courts have
determined that the rule also governs motions to quash filed by
parties, and that the rule requires that motions to quash must also
be brought before the court that issued the subpoena.   See, e.g.,
Jack Frost Labs., Inc. v. Physicians & Nurses Mfg. Corp., No. 92-
9264, 1994 WL 9690, at *1 (S.D.N.Y. Jan 13, 1994)(unpublished).

At a May 3, 2005 telephonic status conference, as well as
during the June 1 sealed hearing, the court raised this issue with
all interested parties.   The parties asked that this court rule on
the motion for protective order, even though the subpoena was

issued by a court from another district.  Based on the parties'
express consent to resolve their dispute in this district, and for
purposes of judicial economy, this court will proceed to address
the merits of the motion.

## B.   Procedural Requirements of Rule 45

Rule 45 provides that

> a person commanded to produce and permit inspection and
> copying may, within 14 days after service of the subpoena
> or before the time specified for compliance if such time
> is less than 14 days after service, serve upon the party
> or attorney designated in the subpoena written objection
> to inspection or copying of any or all of the designated
> materials or of the premises.

Fed. R. Civ. P. 45(c)(2)(B).  This requirement forces "the
recipient of a subpoena to raise all objections at once, rather
than in staggered batches, so that discovery does not become a
'game.'" In re DG Acquisition Corp., 151 F.3d 75, 81 (2d Cir.
1998)(citing United States v. Bryan, 339 U.S. 323, 331 (1950)).
Generally, subpoenaed persons failing to object to subpoenas within
that fourteen-day window waive the right to assert any objections.
Id.; Am. Elec. Power Co., Inc. v. United States, 191 F.R.D. 132,
136 (S.D. Ohio 1999).  At least one court has found that parties
(in addition to non-parties) are bound by the fourteen-day
limitation of Rule 45(c).  See Oneida, Ltd. v. United States, 43
Fed. Cl. 611, 616 (Fed. Cl. 1999).  In Oneida, the defendant issued
subpoenas to three of plaintiff's experts, and the subpoena

directed each expert to produce certain documents.[4]   Id. at 613.
Prior to producing the documents to the defendant, each expert sent
responsive documents in their possession to plaintiff's counsel,
who reviewed the documents.   Id. at 614.   After plaintiff's counsel
reviewed the documents, some documents were produced to the
defendant.[5]   Id.   During the deposition of these experts, the
defendant learned that some documents had been withheld by the
plaintiff's counsel, but at no point prior to the deposition did
plaintiff's counsel object to production of any of the expert's
documents.   Id.   The defendant requested any documents withheld by
the plaintiff's counsel, but counsel responded that they were
privileged materials.   Id.   This response was the first written
objection to the subpoena, and it came sixty days after the
issuance of the first subpoena.   See id.   The defendant filed a
motion to compel approximately three months after the issuance of
the subpoenas.   Id. at 615.

     The Oneida court concluded that the plaintiff waived all
objections, including those based on the work product doctrine,
because it failed to object to the subpoena within the time allowed

---

    [4]The subpoenas directed document production within five,
seven, and eleven days after their issuance.

    [5]With respect to two of the three experts, Plaintiff's
counsel returned some of the documents to the experts, who
forwarded the documents to the defendant.   Plaintiff's counsel
forwarded the documents from the third expert to the defendant
without returning them to the expert.

under Rule 45(c).  <u>Id.</u> at 616-17.  The court stated, among other things, that parties should be governed by the same time limitations provided by the rule.  <u>Id.</u> at 616 n.8.

This court agrees with the analysis in <u>Onieda</u>.  Parties have a greater interest in protecting the disclosure of privileged documents in their own case, as compared to a non-party to whom the subpoena was directed.  If the rule requires a non-party, who may have little or no interest in the underlying case, to object within fourteen days or even sooner (if the date for compliance set forth in the subpoena is less than fourteen days), it is both reasonable and fair to hold an interested party to that same standard.

It is undisputed that Kaufman did not object to the subpoena before the time specified for compliance.  Kaufman's first objection came on November 11, 2004.[6]  This is twenty days after the October 22 deadline specified in the subpoena.  Although the subpoena did not allow Kaufman much time to object, at minimum, written objections should have been made within fourteen days. Accordingly, the court denies the motion for protective order because Kaufman did not timely object to the subpoena as required by Rule 45, and thus, waived any objections.

Under certain limited circumstances, however, the failure to

---

[6]Rule 45(c)(2)(B) explicitly requires the objection to be in writing.  Nothing in the record indicates that Kaufman objected in writing on November 11, but even assuming it did do so, the objection was still untimely.

-10-

serve timely written objections to a subpoena may not constitute a waiver of objections if a court finds there are unusual circumstances and good cause for the failure. Id. at 617. "Specifically, courts have found that the following circumstances may excuse the failure to serve timely written objections: (i) the subpoena is overbroad on its face and exceeds the bounds of fair discovery; (ii) the subpoenaed witness is a nonparty acting in good faith; or (iii) counsel for the witness and counsel for the subpoenaing party were in contact concerning the witness' compliance before the witness challenged the legal basis for the subpoena." Id. (citing Alexander v. FBI, Nos. Civ. 96-2123 & Civ. 97-1288, 1998 WL 292083 (D.D.C. May 28, 1998); Concord Boat Corp. v. Brunswick Corp., 169 F.R.D. 44, 48-51 (S.D.N.Y. 1996); Celanese Corp. v. E.I. duPont de Nemours & Co., 58 F.R.D. 606, 609 (D. Del. 1973)).

Kaufman has failed to demonstrate any unusual circumstances or good cause for failing to object timely. In fact, the only reason that Kaufman gives for failing to object is that it "did not foresee that Dr. Lipsey, an expert with more than thirty (30) years of experience, would disclose privileged material in response to the Plaintiff's Deposition Subpoena." (Plaintiff's Motion at ¶ 2.).

In any event, even if this court were inclined to excuse Kaufman's untimely objections, Kaufman nevertheless has failed to

demonstrate that the documents are protected by the attorney-client privilege or work product doctrine.

## C.    Attorney-Client Privilege

Of the fourteen allegedly protected documents, Kaufman claims seven documents, which comprise five e-mail messages from Joseph Chancey to Dr. Lipsey, are protected by the attorney-client privilege.[7]  In diversity cases such as this, the limits of any privilege must be "determined in accordance with state law."  Fed. R. Evid. 501.

> The privilege is established by the following factors:
>
> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

Humphreys, Hutcheson & Moseley v. Donovan, 568 F.Supp. 161, 175 (M.D. Tenn. 1983)(construing Tenn. Code Ann. § 23-3-105).

In holding that the presence of a professional negotiator at a meeting between a local school board and its attorney did not destroy the attorney-client privilege, the Tennessee Supreme Court has "indicated a willingness to extend the privilege in order to

---

[7]Those five e-mail are labeled with the following Bates numbers: B0445, B0447-448, B0449, B0450, and B0454-455.

cover agents of the client." <u>Royal Surplus Lines Ins. v. Sofamor Danek Group</u>, 190 F.R.D. 463, 469 (W.D. Tenn. 1999)(citing <u>Smith County Educ. Assoc. v. Anderson</u>, 676 S.W.2d 328, 333 (Tenn. 1984). Few Tennessee courts, however, have elaborated on what constitutes an agent for purposes of the attorney-client privilege. <u>See</u> <u>id.</u> "In the absence of any clear authority on point, it is the role of the federal court in diversity cases to consider all of the available legal sources in order to formulate a rule of decision." <u>Id.</u> (citing <u>Anderson Dev. Co. v. Travelers Indem. Co.</u>, 49 F.3d 1128, 1131 (6th Cir. 1995)).

The seminal case on the issue of whether communications between an independent expert or consultant and an attorney are protected by the attorney-client privilege is <u>United States v. Kovel</u>, 296 F.2d 918 (2d Cir. 1961). In <u>Kovel</u>, an attorney hired an accountant to assist the attorney in rendering tax law advice, and the issue before the court was to what extent confidential communications made by a client to an accountant were protected from disclosure. <u>Id.</u> at 918-19. Judge Friendly explained that individuals need attorneys to assist them in the complexities of litigation, and that the client should be able to have "unbounded confidence" in the attorney. <u>Id.</u> at 921. He further stated that the complexities of litigation may require an attorney to obtain specialized knowledge in a particular area from an expert in that field. <u>Id.</u> In emphasizing his point, Judge Friendly used the

example of a client who speaks a foreign language, which would result in the need for the attorney to hire a translator. <u>Id.</u> at 921-22. Ultimately, the court determined that the communications with the accountant would be protected because the accountant's specialized knowledge was necessary for the attorney to provide legal advice. <u>Id.</u> at 922.

The <u>Kovel</u> court limited the scope of its holding, however. Judge Friendly stated that

> Nothing in the policy of the privilege suggests that attorneys, simply by placing accountants, scientists or investigators on their payrolls and maintaining them in their offices, should be able to invest all communications by clients to such persons with a privilege the law has not seen fit to extend when the latter are operating under their own steam.

<u>Id.</u> at 921. Moreover, he emphasized that "[w]hat is vital to the privilege is that the communication be made *in confidence* for the purpose of obtaining *legal* advice *from the lawyer*. If what is sought is not legal advice but only accounting service, or if the advice sought is the accountant's rather than the lawyer's, no privilege exists." <u>Id.</u> at 922 (citations omitted).

Several cases presenting similar facts to the present case have followed <u>Kovel</u>. <u>See, e.g.</u>, <u>ECDC Envir., L.C. v. New York Marine and Gen. Ins. Co.</u>, No. 96-6033, 1998 WL 614478 (S.D.N.Y. June 4, 1998)(unpublished); <u>United States Postal Serv. v. Phelps Dodge Ref. Corp.</u>, 852 F.Supp. 156 (E.D.N.Y. 1994); <u>In re Grand Jury Matter</u>, 147 F.R.D. 82 (E.D. Pa. 1992). In <u>Grand Jury Matter</u>, an

environmental consulting firm withheld production of certain documents responsive to a subpoena, claiming that the privileged documents contain communications between the firm and a company's attorney and that they were for the purpose of assisting the attorney to render legal advice. Grand Jury Matter, 147 F.R.D. at 84. The court agreed with the legal analysis that if the documents were for the purpose of assisting the attorney render legal advice, they would be privileged. Id. at 85. It also stated that "[i]f, however, they were made simply in the course of providing environmental services by the expert consultant of the company, they are not protected even though some of them may be documentation of communications between the expert consultant and the law firm." Id. The court found the documents were not privileged because they were made in the course of the expert consultant's preparation of a waste management plan. Id.

The issue before the Eastern District of New York in Phelps Dodge was whether certain communications by an engineering firm hired to conduct environmental studies of the soil and oversee removal of toxic waste from the plaintiff's land were privileged. Phelps Dodge, 852 F.Supp. at 161. The court concluded that the services provided by the engineering firm were not done to assist the attorneys in litigation. Id. at 162. It also stated that

these consultants based their opinions on factual and scientific evidence they generated through studies and collected through observation of the physical condition of the property, information that did not come through

-15-

client confidences. Such underlying factual data can never be protected by the attorney-client privilege and neither can the resulting opinions and recommendations. There are few, if any, conceivable circumstances where a scientist or engineer employed to gather data should be considered an agent within the scope of the privilege since the information collected will generally be factual, obtained from sources other than the client.

Id.

In ECDC Envir., defendants hired a group of consultants to analyze test data and provide technical assistance concerning the clean-up of a dredge spill from an ocean barge. ECDC Envir., 1998 WL 614478, at *7. Because it did not "appear that they were retained to explain or analyze any pre-existing confidential information in plaintiff's possession or control," communications between the consultants and the plaintiff's attorneys were not privileged. Id. at *7-9.

In the present case, the record before the court indicates that Dr. Lipsey was retained for the purposes of completing environmental sampling and testing, and not for assisting attorneys in providing legal advice. It is undisputed that Dr. Lipsey was first contacted to conduct environmental sampling of WST not by an attorney, but by Susan Tippens, a non-attorney employee of Kaufman.[8]  In his sworn statement, Dr. Lipsey states that no one

_____

[8]As described by Dr. Lipsey in his sworn statement, an environmental sampling is where a scientist takes "air samples and swab samples and bulk samples and [has] them analyzed by an independent lab and then tell[s] the building owner or manager of the results as to what are harmful molds and what levels are harmful and how to remediate or clean[] up."  (Lipsey Sworn

-16-

ever mentioned anything about potential litigation, even after attorney Joseph Chancey contacted him. (Lipsey Sworn Statement, 13:15-21, 14:6-8, 15:25).

Moreover, the alleged privileged communications indicate that Dr. Lipsey was involved merely to report on the health of WST. For example, in the June 6, 2003 e-mail, Chancey suggests they are trying to "calm things" and make Dr. Lipsey's narrative reports available to tenants. (E-mail from Chancey to Dr. Lipsey June 6, 2003, 12:54:17 EST.) Another e-mail on May 23, 2003 indicates that Kaufman was going to provide Dr. Lipsey's report to the tenants. (E-mail from Chancey to Dr. Lipsey (May 23, 2003, 14:41:12 EST).) In an e-mail dated April 18, 2003, Chancey states that the report drafted by Dr. Lipsey "is exactly what we had in mind from the standpoint of a lay reader." (E-mail from Chancey to Dr. Lipsey (April 18, 2003, 11:11:50 EST).) From this e-mail message, it is clear that Dr. Lipsey was hired to make certain tests and report his findings in a document for tenants, and not for the purpose of assisting Chancey in providing legal advice to Kaufman.[9]

Accordingly, this court finds that Dr. Lipsey was not hired to assist an attorney to provide legal advice to Kaufman, and

---

Statement, 12:10-15.)

[9]The professional services contract does not require the court to reach a different conclusion. The contract was not signed by Dr. Lipsey, and he stated that he had never seen the contract until Plaintiff's counsel sent it to him in February 2005.

therefore, communications (including e-mails) between Dr. Lipsey and Chancey are not protected by the attorney-client privilege.[10]

## C.   Work Product Doctrine

Kaufman claims the remaining seven documents at issue are protected by the work-product doctrine.[11]   Unlike the attorney-client privilege, the applicability of the work product doctrine in diversity cases is governed by the federal rules.   See Fed. R. Civ. P. 26(b)(3); Royal Surplus Lines Ins. v. Sofamor Danek Group, 190 F.R.D. 463, 481 (W.D. Tenn. 1999)(citing United Coal Cos. v. Powell Constr., 839 F.2d 958, 966 (3rd Cir. 1988)).

Federal Rule of Civil Procedure 26(b)(3) protects against the discovery of documents and tangible things made in the anticipation of litigation by or for a party or by or for the party's representative, unless the party seeking discovery demonstrates substantial need for the materials and is unable to get the information without undue hardship.   The doctrine creates a zone of privacy and protection for an attorney's preparation on a case.

---

[10]Even if this court were to conclude that Dr. Lipsey was an agent whose communications are protected by the attorney-client privilege, Kaufman would still have to demonstrate that the other elements of the attorney-client privilege are satisfied. Although the court need not resolve these issues, the court questions whether the asserted privilege would survive Dr. Lipsey's disclosure of the documents to the plaintiffs or Kaufman's own public disclosure of the documents by attaching the documents as exhibits to its motion for protective order (which was not filed under seal or in camera).

[11]Those seven documents are labeled with the following Bates numbers: B0439-440, B0451, B0456, B0458, B0466, and B0480.

See <u>Hickman v. Taylor</u>, 329 U.S. 495, 510-11 (1947).  A party can waive its work product protection if it voluntarily discloses documents to the opposing party.  <u>In re Columbia/HCA Healthcare Corp.</u>, 192 F.R.D. 575, 578 (M.D. Tenn. 2000).

The documents at issue are not protected by the work product doctrine because several factors in the record indicate that they were not prepared in anticipation of litigation. First, as discussed in the previous section, Dr. Lipsey did not know that he was preparing anything in anticipation of litigation, as set forth in his sworn statement.

Second, in its answer to the complaint, Kaufman specifically states that Dr. Lipsey "provided advice for resolving mold issues that were discovered at White Station Tower." (Kaufman's Answer at 4.)  Although this may not be completely inconsistent with Kaufman's claim that Dr. Lipsey was retained in anticipation of litigation, it supports the conclusion that Dr. Lipsey was retained to give WST a "clean bill of health."

Third, Kaufman allowed Dr. Lipsey to answer any questions at a WST tenant's meeting in June 2003.  Dr. Lipsey did not have any subject matter limitations placed on him by Kaufman, and there were no attorneys present at the meeting to intervene if someone asked a question that required an answer from Dr. Lipsey that would have revealed work product materials. Moreover, Kaufman's answer states that it "offered to allow the Plaintiff to speak directly to Dr.

Lipsey, who prepared the report, in order to answer any questions that the Plaintiff's might have and to share that information with his counsel and expert." (Kaufman's Answer at 9.) Kaufman's actions are inconsistent with a claim of work product immunity.

Fourth, Kaufman named Dr. Lipsey as a potential comparative tortfeasor in its answer. This places Dr. Lipsey's environmental sampling directly at issue in the case. Plaintiffs clearly have a substantial need for these materials.

Moreover, nothing in the record adequately supports Kaufman's claim that Dr. Lipsey's work was done in anticipation of litigation after Joseph Chancey contacted him. As discussed above, the contract for professional services was not signed by Dr. Lipsey, and he stated that no one informed him of potential litigation. Additionally, the e-mail message introduced at the hearing did not demonstrate to the court that Kaufman and Dr. Lipsey agreed to the unsigned contract for consulting services. Even if the parties' status somehow changed after the purported April 17, 2003 contractual date, three of the seven documents—B0456, B0458, and B0480—were created prior to that date.

Based on all of these factors, the court concludes that the seven documents at issue were not created in anticipation of litigation. Accordingly, the court finds that the documents are

not protected work product.[12]

### III. CONCLUSION

For the reasons above, the motion for a protective order is DENIED.

IT IS SO ORDERED.

_____

TU M. PHAM
United States Magistrate Judge

_June 30, 2005_
Date

---

[12]Even if the court were to conclude that the documents were created in anticipation of litigation, Kaufman would still have the burden to show that it did not waive its work product immunity. See supra n.10.

-21-

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 77 in
case 2:04-CV-02395 was distributed by fax, mail, or direct printing on
July 1, 2005 to the parties listed.

---

Larry E. Parrish
LAW OFFICES OF LARRY E. PARRISH
6075 Poplar Avenue
Ste. 420
Memphis, TN 38119--476

Robert D. Flynn
SPICER FLYNN & RUDSTROM
80 Monroe Ave.
Ste. 500
Memphis, TN 38103--246

Kristi M. Bennett
LEWIS KING KRIEG & WALLDROP, PC
620 Market St.
5th Floor
P.O. Box 2425
Knoxville, TN 37901

Garrett M. Estep
FARRIS MATHEWS BRANAN BOBANGO HELLEN & DUNLAP, PLC
One Commerce Square
Ste. 2000
Memphis, TN 38103

James B. Summers
ALLEN SUMMERS SIMPSON LILLIE & GRESHAM, PLLC
80 Monroe Ave.
Ste. 650
Memphis, TN 38103--246

David A. Draper
LEWIS KING KRIEG & WALDROP, PC
620 Market St.
5th Floor
P.O. Box 2425
Knoxville, TN 37901

Tim Wade Hellen
FARRIS MATHEWS BRANAN BOBANGO HELLEN & DUNLAP, PLC
One Commerce Square
Ste. 2000
Memphis, TN 38103

Pam Warnock Green
MCNABB BRAGORGOS & BURGESS, PLLC
81 Monroe Ave.
Sixth Floor
Memphis, TN 38103--540

Reagan F. Goins
ALLEN SUMMERS SIMPSON LILLIE & GRESHAM, PLLC
80 Monroe Ave.
Ste. 650
Memphis, TN 38103--246

Honorable Bernice Donald
US DISTRICT COURT